DAN ROWAN CORTRIGHT, SBN 206856
THE ROWAN FIRM
PO Box 2061
Sebastopol, California 95473
707-360-1009
dan@therowanfirm.com

Attorneys for Plaintiff
LISA ROTH

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| LISA ROTH, an individual, | Case No.: 2:24-cv-2756 |
| Plaintiff, | **COMPLAINT FOR:** |
| vs. | 1. **Violation of the CA Fair Employment And Housing Act,** |
| THE PERCH PROJECT, LLC DBA THE PERCH APARTMENTS, a Delaware limited liability company; ROUNDHOUSE COMMUNITIES, LLC, a Delaware limited liability company; 4247 Eagle Rock #200Q, LP, a business entity, form unknown; ABRA MANAGEMENT, INC., a California corporation; SAMANTHA GORMAN, an individual; and DOES 1-30, inclusive, | 2. **Violation of The Unruh Civil Rights Act,** 3. **Breach of Contract,** 4. **Breach of The Covenant of Quiet Enjoyment/Warranty of Habitability,** 5. **Negligent Violation of Statutory Duty,** 6. **Constructive Eviction;** 7. **Negligence/Premises Liability; and** 8. **Intentional Infliction of Emotional Distress** |
| Defendants. | **Jury Trial Demanded** |

COMES NOW Plaintiff Lisa Roth ("Plaintiff") and alleges as follows:

## INTRODUCTION

1.     Plaintiff brings this action against Defendants THE PERCH PROJECT, LLC DBA THE PERCH APARTMENTS; ROUNDHOUSE COMMUNITIES, LLC, 4247 Eagle Rock #200Q, LP, ABRA MANAGEMENT, INC., SAMANTHA GORMAN, and DOES 1-30 (collectively, "Defendants") for unlawfully and intentionally discriminating against Plaintiff because of her

disability/handicap and denying Plaintiff equal access to the dwelling/housing accommodation located 4247 Eagle Rock Blvd, Unit 316, Los Angeles, CA 90065 (the "Accommodation"), which Defendants own/owned, operate/operated, or otherwise control/ controlled, as well as for breach of contract, breach of the covenant of quiet enjoyment/breach of the warranty of habitability, fraud/intentional misrepresentation, negligence/premises liability, and intentional infliction of emotional distress.

## **PARTIES**

2.      Plaintiff is a natural person. At all times relevant to this Complaint, Plaintiff is and has been considered disabled.

3.      At all times mentioned herein, defendant The Perch Project, LLC dba The Perch Apartments (the "Perch") was, on information and belief, a Delaware limited liability company.

4.      At all times mentioned herein, defendant 4247 Eagle Rock #200Q, LP ("4247 LP") was, on information and belief, a business entity, form unknown.

5.      At all times mentioned herein, defendant ABRA Management, Inc. ("ABRA") was, on information and belief, a California corporation.

6.      At all times mentioned herein, defendant Roundhouse Communities, LLC ("Roundhouse") was, on information and belief, a Delaware limited liability company.

7.      At all times mentioned herein, defendant Samantha Gorman ("Gorman"), who was an employee of ABRA, is an individual residing, on information and belief, in California.

8.      The true names and capacities, whether individual, corporate, or otherwise of the defendants named in this Complaint as Does 1 through 30, inclusive, are unknown to Plaintiff. Plaintiff is informed and believes, and on that basis alleges, that each of said fictitiously named defendants is liable to Plaintiff on some or all of the causes of action herein alleged and therefore Plaintiff sues said defendants by said fictitious names.  Plaintiff will move to amend this Complaint when the true names and capacities of said fictitiously named defendants are ascertained.

**THE ACCOMODATION**

9.    The Accommodation is a building, structure, or portion thereof, which is intended for occupancy as a residence by one or more persons.

**JURISDICTION AND VENUE**

10.    The Court has subject matter jurisdiction over the action pursuant to 28 U.S.C. § 1332.

11.    Pursuant to supplemental jurisdiction, 28 U.S.C. § 1367, attendant and related causes of action, arising from the same nucleus of operative facts and arising out of the same transactions, are also brought under California state law.

12.    Venue is proper in this court pursuant to 28 U.S.C. § 1391(b) and is founded on the fact that the Accommodation is within this judicial district and Plaintiff's causes of action arose in this district.

**FACTUAL ALLEGATIONS**

13.    Plaintiff suffers from a disability and/or medical condition(s) that is/are a disability.

14.    Plaintiff suffers from Mast Cell Activation Syndrome, MCS (multiple chemical sensitivity), limbic system impairment, extreme temperature dysregulation and uncontrollable vomiting caused by a severe mold allergy.  Plaintiff has been disabled with her conditions since approximately 2019/2020, and also now suffers from neuropathy and other symptoms acquired while living in the Accommodation, including the inability to use her hands because of shaking tremors and pain, nerve damage, central nervous system damage, cognitive impairment, and Plaintiff's inability to swallow food or water.  Plaintiff's disability symptoms substantially limit and greatly affect her major life activities.

15.    Plaintiff deals with the symptoms of her various disabilities on a daily basis.

16.    During Plaintiff's tenancy at the Accommodation, defendants owned, operated, managed or controlled the Accommodation.  Plaintiff began residing at the Accommodation in April 2020.

17.    Starting on April 26, 2020, Plaintiff's unit air conditioner began leaking water and making a loud noise, which continued throughout her tenancy until early 2023.  Plaintiff continually reported this issue to the various property manager defendants over the nearly three years she lived there, and defendants sent several maintenance persons to inspect and repair the unit.  However, some told Plaintiff there was nothing wrong with her air conditioner, others told her they did not know how to fix the problem, others told her she needed to clean the dust in her apartment as that was causing the A/C unit to malfunction.  Even after contacting her own air conditioner technician to repair the air conditioner, who told Plaintiff the A/C unit was installed improperly and attempted to repair it, the A/C unit still did not work and continued to leak water on the concrete floor of Plaintiff's apartment unit.

18.    In fact, as a result of the standing water leaking from her A/C unit, Plaintiff slipped and fell, twice, becoming injured as a result of her falls.

19.    As a result of the standing water from the leaking A/C unit and the resulting mold growth in the A/C ducts/unit and chemicals being emitted thereby, Plaintiff began experiencing increased symptoms of her severe mold allergy, as well as new and different medical symptoms, including significant neuropathy, an increase in her uncontrollable violent vomiting, internal tremors, inability to use her hands because of shaking tremors and pain, nerve damage, central nervous system damage,  antibiotic resistant bacterial infections, chronic urinary tract infections that were not responsive to antibiotics (Plaintiff had infections the entire time she lived there, every single day), cognitive impairment, early menopause, fatty liver, anxiety, respiratory issues and Plaintiff's inability to swallow food or water.

20.     Beginning on April 5, 2020, Plaintiff requested maintenance/repairs and accommodations to alleviate her symptoms from the mold allergy and chemical sensitivity she was experiencing in her unit.  Such accommodation requests included an air conditioner capable of reducing the temperature in her unit below 71 degrees (it was locked at this temperature and would not go lower) and that does not leak water and make a loud ringing noise nearly constantly, and that her bathroom exhaust fan to be turned on (it was not turned on when she moved in, resulting in there being absolutely no ventilation).

21.     Defendants Roundhouse and Perch did not adequately repair the broken air conditioner, breaching their lease agreement with Plaintiff.  Thereafter, defendants ABRA, 4247 LP and Gorman also refused to provide Plaintiff with a working air conditioner unit until nearly the end of her tenancy.  These defendants' refusal was also a breach of the Lease Contract terms that applied to them pursuant to its terms.

22.     Plaintiff made additional requests for accommodation to defendants during June 2021 when she requested repair to the elevator nearest her apartment due to her severe illness not permitting her feasibly to use the other elevator on the far side of the large building.  Further, Plaintiff began at this time to receive electric shocks from her clothes drying machine which was also producing lint that burned her skin when touched.  Further, while showering in her unit, Plaintiff's skin was burned by the water, which likely had a high chlorine or other chemical content to which Plaintiff was allergic/intolerant.

23.     Defendants Roundhouse and Perch refused to maintain a working elevator, to remedy the water contamination issue or to repair Plaintiff's dryer such that she would not receive burns or electric shocks from it.

24.     At the end of April/early May 2022, after her leaking air conditioner unit had still not been replaced or repaired, despite multiple requests, Plaintiff slipped and fell on the wet concrete

floor of her unit twice becoming injured.  She reported these falls/injuries to defendants ABRA, 4247 LP and Gorman, yet no response was received from any defendant.

25. In June 2022, ABRA's property manager employee Mayra Ruiz informed Plaintiff that management was closing one of the two garbage rooms where the trash bins are stored for residents of all 59 units in the Accommodation.  Subsequent to this, there was inadequate space for all residents' trash to be safely and sanitarily disposed of.

26. In August 2022, Plaintiff again complained to defendants of the A/C unit leaking water onto her floor and requested that she be permitted to have her own air conditioning technician come repair the unit, but defendants refused saying they would provide their own repairman.  The A/C unit did not get fixed.

27. From August 19-22, 2022, Plaintiff reported lower right back pain to her doctor, which at the time she did not realize was the result of her slip and falls in early May.  Furthermore, at this time Plaintiff's teeth began breaking resulting in horrific mouth and tongue cuts.  This symptom she later found out was related to the many conditions in her unit at the Accommodation that she reported many times (water contamination, mold, chemicals).

28. In September 2022, defendants ABRA/4247 LP's building maintenance man at the Accommodation, Diego, saw Plaintiff faint twice and become violently ill (vomit) in front of him as a result of her reaction to the conditions inside her apartment.  In addition, defendant Gorman emailed Plaintiff indicating that their A/C technicians found nothing wrong with her A/C unit and consider the matter closed, despite the fact the A/C unit still leaked a tremendous amount of water (causing a slip/fall hazard) and was still making a horrible noise.  Gorman later physically assaulted Plaintiff during the replacement of the A/C unit.

29. In October 2022, Plaintiff discovered from her neighbors at the Accommodation that their A/C units were also unmaintained and leaking water and that the filters were not changed regularly.  On October 17, 2022, Plaintiff made another accommodation request to ABRA

indicating her health issues had gotten so severe that she was extremely concerned for her medical

health. This request also included a request that proper notice be given to enter her unit, as Diego,

the maintenance man opened Plaintiff's door once while she was unclothed and vomiting violently,

causing Plaintiff extreme embarrassment, emotional distress and humiliation. Defendants refused to

accommodate Plaintiff's request for a 2-hour maintenance window such that these events could be

avoided. Her illnesses caused her to become violently ill frequently, and she informed defendants

that just showing up after providing 24 hours' notice for the maintenance call was insufficient to

allow her to be in a position to permit the maintenance man entry to her unit.

30.     Defendants' management was not helpful or respectful and treated Plaintiff as if she

were mentally ill and unstable. And at this time, Plaintiff began to have burning in her hands and

arms, her hands and arms were going numb, she was unable to remember anything at all, especially

while she was speaking. She could not remember what she was even talking about and began to

hallucinate. She had horrific pulsatile tinnitus that she never had before, had word recall problems

and horrific neuropathy. She discovered about this time that these symptoms were being caused by

the conditions in her unit at the Accommodation. Defendants continued to tell Plaintiff that her A/C

unit was dusty (she had informed them of her severe dust and dust mite allergies) and she needed to

clean it. Apparently, the A/C unit had never been cleaned by any of defendants' maintenance

workers or A/C techs they sent to inspect/repair it.

31.     Starting in October 2022, Plaintiff began having her apartment tested for mold and

discovered there was significant mold presence caused in part by the leaking A/C unit and

uncleaned A/C ducts. She then discovered that her increased and severe medical symptoms were in

fact caused by the conditions in her unit that defendants failed to remediate/repair despite her

multiple and repeated requests.

32.     Plaintiff also performed at-home water contamination tests on her shower water to

discover that the water provided to her unit was drastically contaminated, which further added to

her injuries and medical symptoms.

33.     Also, in November 2022, Plaintiff requested from defendant ABRA to have independent environmental testing on her A/C unit and her apartment, but ABRA did not respond to these requests.

34.     At this time, Plaintiff had become bedridden due to her severe medical symptoms. Throughout her tenancy at the Accommodation, she was required to add more and more medications to alleviate her symptoms.  She was overheating (due to her extreme heat intolerance), requiring her to run her A/C unit nearly constantly.  Of course, until this time she had not realized it was her A/C unit contributing to her sickness.

35.     In December 2022, after Plaintiff sent defendants her own environmental testing reports indicating the A/C unit was contaminated and causing mold in her unit, ABRA finally replaced her A/C unit, long after Plaintiff was made severely more sick by having it run for nearly three years without proper maintenance.  Additionally, at this time, Plaintiff provided defendants with a doctor's letter indicating her apartment conditions were making her so ill that she could not stay one more minute in that unit at the Accommodation without risking her very life.  ABRA refused to provide alternate accommodations for Plaintiff, despite her request for same.

36.     Moreover, on the day the A/C unit was replaced, defendant Gorman physically prevented Plaintiff from even watching the unit being replaced to ensure proper safety and environmental protocols were being utilized.  Gorman even physically assaulted Plaintiff during this time in an attempt to prevent Plaintiff from seeing the work being done.  Gorman chased Plaintiff down the hallway screaming at Plaintiff: "THAT IS NOT YOUR PROPERY!!" referring to Plaintiff's attempt to see the A/C unit replacement work.  When Plaintiff attempted to return to her apartment, Gorman body-checked Plaintiff, physically assaulting her to block Plaintiff's attempt to enter her apartment.

COMPLAINT                                                                 2:24-cv-2756

37. Plaintiff saw that the workmen doing the replacement had absolutely no safety protocols in place and did a "smash and grab" replacement of the A/C unit leaving contaminants everywhere around Plaintiff's apartment, including 27,000 spores of Cladosporium mold in the air in her unit.

38. Also, while removing the A/C unit, defendants sprayed chemicals inside Plaintiff's unit, despite her having repeatedly informed them previously of her severe chemical intolerance disability.

39. Plaintiff had previously requested that ABRA provide her with the time of the A/C unit replacement so that she could ensure independent environmental testing could be done of the inside of the unit and her air ducts. ABRA refused. However, after Plaintiff got violently ill in front of Gorman and the others performing the replacement, they all left her apartment and Plaintiff had the ducts tested. However, because ABRA/Gorman did not honor Plaintiff's request to have her own testing done on the old A/C unit and had their own testing done, Plaintiff's independent environmental testing agent refused to do any testing claiming the old unit's parts had been contaminated.

40. With the air ducts exposed in Plaintiff's unit containing the Cladosporium spores, she suddenly could not breathe, her internal vibrating was extremely debilitating, and she had seizures while sitting in her car. Plaintiff was forced to take an ambulance for medical help.

41. ABRA stated they needed to leave the air scrubber in Plaintiff's apartment for 24 hours after removing her old A/C unit. However, Plaintiff's doctor's orders were that no air scrubber could be in her apartment while she was there, as it disturbed the particles that were harming Plaintiff. When Plaintiff returned from her hospital visit, the air scrubber was still on, and Plaintiff had an immediate reaction and could not breathe. She emailed ABRA management about the issue, but they told her to stay in the apartment and told her that it was fine to sleep in the

apartment with the air scrubber on. ABRA management are not medical professionals, and this advice directly contradicted Plaintiff's own medical professional's advice.

42. When Plaintiff stopped paying rent as a result of her being forced to live in an uninhabitable unit causing her so much illness and distress, ABRA threatened to evict her forcing Plaintiff to continue paying rent for a unit at the Accommodation that was far below health and safety standards and was indeed uninhabitable and a serious threat to her health.

43. As a result of the extreme presence of mold in her unit at the Accommodation and Plaintiff's severe mold allergy, she was forced to throw out all of her belongings/clothes. Plaintiff hired an expensive independent environmental professional to inspect her unit and provide reports. These reports are attached hereto collectively as Exhibit A and confirm the presence of mold and various harmful chemicals and metals, flame retardants, toxins and Stachybotrous/mucor (black mold) and more. This professional also discovered there was never a filter from outside air for Plaintiff's A/C unit (a discrete code violation). He confirmed that all units in the Accommodation were likely built the same way. He further confirmed Plaintiff's unit had no ventilation which caused Plaintiff's unit to reach 76 degrees with no heat on (a significant problem for Plaintiff's extreme temperature intolerance).

44. In addition to the foregoing, Plaintiff's two dogs had seizures in her apartment, and one had a horrible skin infection that looked like flesh-eating bacteria all over his head. When Plaintiff got a new dog (after the other two died), the new dog also began to have seizures in the apartment. As soon as Plaintiff moved out, this new dog's seizures stopped.

45. During 2022, as a direct result of the conditions in her apartment and her symptoms caused thereby, Plaintiff lost the use of her hands almost completely and had to begin using scissors to open anything.

46. Plaintiff had searched for alternative living conditions, but due to the COVID pandemic her search proved unfruitful. She was finally able to move out of the Accommodation in

early 2023, but not until after suffering from severe medical symptoms and becoming subject to several new medical conditions/injuries received while she lived there.

## **FIRST CAUSE OF ACTION**

<u>Violations of the California Fair Employment and Housing Act - Cal. Gov. Code§§ 12900 et seq.</u>

(Against all Defendants)

47.     Plaintiff hereby incorporates all previous paragraphs as if they have been fully stated herein.

48.     The Accommodation was and is a housing accommodation.

49.     Plaintiff is a person with disabilities defined under state law.  She suffers from: Mast Cell Activation Syndrome, MCS (multiple chemical sensitivity), limbic system impairment, extreme temperature dysregulation and uncontrollable vomiting caused by severe mold allergy, as well as several other conditions that arose from exposures during her time at the Accommodation including neuropathy, an increase in her uncontrollable vomiting, internal tremors, inability to use her hands because of shaking tremors and pain, nerve damage, central nervous system damage, cognitive impairment, and Plaintiff's inability to swallow food or water.

50.     Defendants own/owned, operate/operated, manage/managed or otherwise control/controlled a building or structure, or a portion thereof, occupied as or designed or intended for occupancy as a residence by one or more persons.

51.     It is unlawful for Defendants to discriminate against Plaintiff because of Plaintiff's disabilities.

52.     Defendants intentionally discriminated against Plaintiff because of Plaintiff's disabilities as more fully set forth herein.  Defendants have made unavailable or otherwise denied full and equal access to a dwelling to Plaintiff on the basis of her disabilities.

53.     Defendants' policy of denying persons with disabilities full and equal access had a discriminatory effect against people with disabilities, such as Plaintiff.

54.     Defendants have refused to engage in the interactive process, to provide needed repairs when requested regarding the issues surrounding Plaintiff's accommodation requests, and failed to provide a reasonable accommodation to Plaintiff after same was requested several times.

55.     Further, Defendants made statements that indicate a preference, limitation, or discrimination, with respect to a housing accommodation, on a disallowed basis: specifically, disability.

56.     Plaintiff has been injured as result of Defendants' conduct, including, but not limited to, physical and mental injury, emotional distress, humiliation, and embarrassment.

57.     Plaintiff seeks actual damages, punitive damages, an injunction, reasonable attorney's fees and costs, including expert witness fees if applicable, and any other such relief the court deems appropriate.

58.     Wherefore, Plaintiff prays for judgment as set forth herein.

**SECOND CAUSE OF ACTION**

Violations of the Unruh Civil Rights Act - California Civil Code §§51-53

(Against ABRA, 4247 LP, Samantha Gorman and Gregory Spinrad)

59.     Plaintiff hereby incorporates all previous paragraphs as if they have been fully stated herein.

60.     The Accommodation is a business establishment, which applicable law defines to include residential dwellings.

61.     Defendants intentionally discriminated against Plaintiff because of Plaintiff's disabilities.

62.     Defendants' acts and omissions with regard to the discriminatory treatment of Plaintiff on the basis of Plaintiff's disabilities, have been in violation of California Civil Code §§51 and 51.5, the Unruh Civil Rights Act, and have denied to Plaintiff the right to full and equal accommodations, advantages, facilities, privileges, or services in a business establishment.

1    63.    Plaintiff was harmed by Defendants' discriminatory actions.

2    64.    Defendants' conduct was a substantial factor in causing Plaintiff's harm.

3    65.    As a result of the violation of Plaintiff's civil rights protected by California Civil

4  Code §§51 and 51.5, Plaintiff is entitled to the rights and remedies of California Civil Code §52,

5  including a trebling of actual damages, minimum statutory damages, as well as reasonable attorneys'

6  fees and costs, as allowed by statute, according to proof, and Plaintiff seeks the same.

7    66.    Plaintiff also seeks to enjoin Defendants from further violating disabled persons'

8  rights.

9    67.    Wherefore, Plaintiff prays for judgment as set forth herein.

10                              **THIRD CAUSE OF ACTION**

11                                Breach of Contract

12                              (Against Perch and 4247 LP)

13    68.    Plaintiff hereby incorporates all previous paragraphs as if they have been fully stated

14  herein.

15    69.    On March 25, 2020, Plaintiff and defendant Perch entered into a Lease Contract for

16  Plaintiff to rent the Accommodation for a term of 14 months from April 4, 2020 to June 3, 2021.  A

17  true and correct copy of this Lease Contract is attached hereto as Exhibit B.

18    70.    Regarding air conditioning, the Lease Contract specifically states in paragraph 27:

19  "If air conditioning or other equipment malfunctions, you must notify our representative as soon as

20  possible on a business day. We'll act with customary diligence to make repairs and reconnections."

21  However, despite this affirmative promise in the Lease Contract and Plaintiff's multiple written

22  requests for repair to her air conditioning unit, Perch did not act "with customary diligence to make

23  repairs" thereto, leaving constant dripping water on Plaintiff's floor which caused her physical

24  injury twice.  Perch's failure to repair the air conditioner is a breach of their own lease term.

25    71.    Moreover, the Lease Contract states, at paragraph 37, that: "This Lease Contract

binds subsequent owners." Thus, 4247 LP and its agent ABRA were bound by the terms of the Lease Contract as well to make repairs "with customary diligence" and they failed to do so as well. Additionally, attached hereto as Exhibit C is a true and correct copy of the Residential Lease/Rental Agreement entered into between Plaintiff and 4247 LP on or about 7/14/22.

72.     Throughout Plaintiff's tenancy at the Accommodation, defendants continued to fail to repair numerous issues with her unit, including the leaking air conditioner which caused a constant water hazard on which Plaintiff was injured twice, and even resorted to spraying chemicals in her unit while attempting repairs, knowing Plaintiff was highly sensitive and susceptible to injury from such chemicals.  Plaintiff had told defendants on numerous occasions of her medical conditions and extreme sensitivity to any chemicals, yet defendants' employees failed and refused to provide her with the accommodation of refraining from using such harmful chemicals in her unit or in her presence.

73.     Defendants' actions as herein described were in breach of the terms of her leases with defendants, as well as in breach of the warranty of habitability and covenant of quiet enjoyment implied in every residential lease agreement.

74.     As a result of defendants' actions, Plaintiff was severely harmed and suffered damages in an amount to be proven at trial, but in no event less than the amount she paid in rent at the Accommodation, the cost of her personal property she was forced to throw out, as well as her attorneys' fees (pursuant to the Lease Contract and Residential Lease/Rental Agreement and costs of treatment for the symptoms she experienced as a direct result of defendants' actions and failures to act.

75.     Wherefore, Plaintiff prays for judgment as set forth herein.

## **FOURTH CAUSE OF ACTION**

### Breach of the Covenant of Quiet Enjoyment/Warranty of Habitability
### Cal. Civil Code §§1927, 1941 et seq.

1       (Against Perch, Roundhouse, ABRA and 4247 LP)

2       76.     Plaintiff hereby incorporates all previous paragraphs as if they have been fully stated

3   herein.

4       77.     As the renter of the Accommodation, Plaintiff was entitled to the benefit of the

5   covenant of quiet enjoyment and warranty of habitability implied in every residential lease

6   agreement.  (Cal. Civil Code §§1927, 1941 et seq.)

7       78.     One of the terms of the Lease Contract states that "You accept the dwelling, fixtures,

8   and furniture as is, *except for conditions causing the premises to be untenantable under California*

9   *Civil Code 1941.*" (emphasis added.) California Civil Code §1941.1(a) states that "A dwelling shall

10  be deemed untenantable for purposes of Section 1941 if it substantially lacks any of the following

11  affirmative standard characteristics… (6) Building, grounds, and appurtenances at the time of the

12  commencement of the lease or rental agreement, and all areas under control of the landlord, kept in

13  every part clean, sanitary, and free from all accumulations of debris, filth…"

14      79.     In April 2020, shortly after move-in, Plaintiff reported to Perch that her unit, which

15  did not have any window in the bathroom, did not have an operable exhaust fan (leaving the

16  bathroom unventilated and subject to extreme mold growth), the air conditioner was locked at 71

17  degrees and unable to cool the apartment to a lower temperature[1] and was leaking a substantial

18  amount of water onto her floor and making a ringing sound constantly, the toilet did work properly

19  and overflowed regularly (both of which were continuing issues Plaintiff reported over and over

20  again).  Later, Plaintiff reported that the washer/dryer did not operate properly, and the dryer lint

21  was so hot it actually burned her skin to the touch.

22      80.     With respect to the air conditioner, when it was finally replaced in early 2023,

23  Plaintiff was horrified to discover that, not only was it missing a filter for the air being drawn in

24

25  _____
[1] Plaintiff informed them of her extreme temperature dysregulation/body overheating and need for a lower temperature.

from outside, but the inside of the unit as well as all attached ducts were filthy with dirt and mold, both of which had been blown into her unit at the Accommodation throughout her tenancy, causing her significant injury. She hired an independent environmental inspector to inspect for mold or other harmful contaminants/substances, who found Stachybotrys mold and various other harmful substances in Plaintiff's unit. See Rush report attached hereto as Exhibit A.

81. The regularly overflowing toilet was also a specific breach of the warranty of habitability and covenant of quiet enjoyment as well. As Civil Code §1941.1(a) (2) states, a unit is untenantable if it lacks "Plumbing or gas facilities … maintained in good working order."

82. Furthermore, in June 2022, defendant 4247 LP, through its property manager at that time ABRA, informed Plaintiff that management was closing one of the two rooms where the garbage receptacles were kept for the entire building (59 units), leaving only one room for all residents to dispose of their trash. Civil Code §1941.1(a)(7) provides that a dwelling is untenantable if it lacks: "An adequate number of appropriate receptacles for garbage … in clean condition and good repair … with the landlord providing appropriate serviceable receptacles … and being responsible for the clean condition and good repair of the receptacles under his or her control." Following management's removal of one of the two garbage rooms, the tenants, including Plaintiff, were left with inadequate receptacles into which they could dispose of their trash. Another clear breach of the covenant of quiet enjoyment and warranty of habitability.

83. Finally, the stove in Plaintiff's unit was not ventilated at all, causing toxic smoke/fumes from cooked food to remain in her unit which she was forced to breathe in regularly.

84. On or about July 14, 2022, Plaintiff signed a Residential Lease/Rental Agreement with the new owner of the Accommodation 4247 LP. A true and correct copy of the Residential Lease/Rental Agreement is attached hereto as Exhibit C.

85. Despite her repeated complaints, defendants Perch, Roundhouse, ABRA and 4247 LP failed and refused to repair these conditions, rendering her unit untenantable and dangerous to

1    Plaintiff's health and safety during her entire tenancy under the Civil Code.  These untenantable

2    conditions that went unremedied also amounted to a clear breach of the covenant of quiet

3    enjoyment, as they substantially interfered with Plaintiff's right to the use and enjoyment

4    of the Accommodation.

5         86.    As a direct result of defendants' actions as herein alleged, Plaintiff suffered

6    substantial damages in an amount to be proven at trial.  Further, as this tort cause of action is based

7    on an implied warranty included in the lease agreements between Plaintiff and defendants, and both

8    lease agreements have an attorneys' fee clause, Plaintiff is entitled to recover her attorneys' fees.

9         87.    Wherefore, Plaintiff prays for judgment as set forth herein.

10                              **FIFTH CAUSE OF ACTION**

11                          Negligent Violation of Statutory Duty

12                          (Against defendants 4247 LP, ABRA)

13        88.    Plaintiff hereby incorporates all previous paragraphs as if they have been fully stated

14   herein.

15        89.    The laws and regulations of the State of California, including but not limited to,

16   Sections 1714 and 1941.1 of the Civil Code, impose a statutory duty on defendants to maintain the

17   Accommodation in a safe and habitable condition.  A "due regard for human safety and health

18   compels the imposition on a landlord of a duty of due care in the maintenance of the premises…

19   Civil Code section 1941 and the housing codes of California were designed to protect the health and

20   safety of tenants…"  (*Stoiber v. Honeychuck*, 101 Cal. App. 3d 903, 924.)

21        90.    In negligently failing to repair the aforementioned defective and dangerous

22   conditions, defendants have breached their statutory duty to Plaintiff.

23        91.    Defendants' breach of their statutory duty is the direct cause of Plaintiff's damages

24   as more fully set forth herein.

25

1   92.   Plaintiff is entitled to compensatory damages for the discomfort and annoyance she

2   suffered in the reasonable amount of $50 for each day she lived at the Accommodation as well as

3   property damage, including the replacement cost for all of her clothes and other personal belongings

4   and furniture she was forced to dispose of due to contamination with mold and other harmful

5   chemicals.

6   93.   Wherefore, Plaintiff prays for judgment as set forth herein.

7   **SIXTH CAUSE OF ACTION**

8   Constructive Eviction
    (Cal. Civil Code §1940.2)

9   (Against 4247 LP, ABRA & Gorman)

10  94.   Plaintiff hereby incorporates all previous paragraphs as if they have been fully stated

11  herein.

12  95.   California Civil Code §1940.2 states that:

13  It is unlawful for a landlord to do any of the following for the purpose of
    influencing a tenant to vacate a dwelling:

14  (a)(3) Use, or threaten to use, force, willful threats, or menacing conduct
    constituting a course of conduct that interferes with the tenant's quiet
15  enjoyment of the premises in violation of Section 1927 that would create
    an apprehension of harm in a reasonable person. Nothing in this paragraph
16  requires a tenant to be actually or constructively evicted in order to obtain
    relief.

17  (a)(4) Commit a significant and intentional violation of Section 1954.

18  Section 1954 of the Civil Code prohibits a landlord from entering a tenant's unit

19  without proper notice and provides: "The landlord may not abuse the right of access or

20  use it to harass the tenant."  It also provides that 24 hours' notice is "presumed reasonable

21  notice in the absence of evidence to the contrary."

22  96.   Here, Plaintiff informed defendants more than once that as a direct consequence of

23  her medical disability and conditions/symptoms caused thereby that she required not only 24 hours'

24  notice, but less than a 2-hour window for maintenance visits from defendants' employees.  She

25  emailed these requests to defendants with an explanation as to why this was necessary to permit her

    to be clothed and available to receive the maintenance employee into her unit, constituting

18

"evidence to the contrary" that 24 hours' notice alone was sufficient for this tenant.

97.     Furthermore, as stated herein, defendants 4247 LP, ABRA and Gorman used "menacing conduct constituting a course of conduct that interfere[d] with [Plaintiff]'s quiet enjoyment of the [Accommodation] in violation of [Civil Code] Section 1927 that [did] create an apprehension of harm in [Plaintiff]."  On at least one occasion, Gorman physically assaulted Plaintiff and screamed at her in the hallway of the building during the A/C unit replacement work, causing significant apprehension of harm in Plaintiff.

98.     Frustrated and becoming more and more ill by the day during her residency at the Accommodation, Plaintiff searched for alternate living conditions, as she felt she could not live there any longer.  However, at first due to the global COVID pandemic she found it very difficult to find an alternate residence that would accommodate her serious medical conditions/symptoms.  But finally, after being told by her medical professional that she could not live at the Accommodation another day without risking her life, she moved.  All of the facts herein stated constitute a constructive eviction of Plaintiff.

99.     Plaintiff suffered significant damages as a result of her constructive eviction, including all of her relocation expenses, medical costs caused by defendants' failure to repair the conditions that violated Plaintiff's quiet enjoyment of the Accommodation, as well as a civil penalty of $2,000 for each violation and damages for mental anguish, and punitive damages.  (See *Stoiber v. Honeychuck*, 101 Cal. App. 3d 903, 926.)

100.    Wherefore, Plaintiff prays for judgment as set forth herein.

## SEVENTH CAUSE OF ACTION

Negligence/Premises Liability

(Against defendants 4247 LP and ABRA)

101.    Plaintiff hereby incorporates all previous paragraphs as if they have been fully stated herein.

102.    As the owners/property managers of Plaintiff's residence (the Accommodation), defendants had a duty to prevent injury to Plaintiff through their acts or omissions.  The owner of

premises is under a duty to exercise ordinary care in the management of such premises in order to avoid exposing persons to an unreasonable risk of harm. A failure to fulfill this duty is negligence. (*Brooks v. Eugene Burger Management Corp.* (1989) 215 Cal.App.3d 1611, 1619.)

103.    Defendant 4247 LP owned the Accommodation and through its agent ABRA controlled/managed the Accommodation. Defendants were negligent in their maintenance of the Accommodation as set forth herein.

104.    Defendants ABRA and 4247 LP breached their duty of care to Plaintiff by failing to remedy the leaking water from her air conditioner, which caused the dangerous condition of a puddle of standing water to constantly exist in her unit. At the end of April/early May of 2022 Plaintiff slipped in this puddle of water twice two days apart resulting in injury to her low back and right hand and wrist. When Plaintiff reported these injuries to defendants, they ignored her reports.

105.    In addition to these injuries, as a direct result of defendants' actions as set forth herein, Plaintiff suffered from new injuries that arose throughout her tenancy at the Accommodation, including, but not limited to, neuropathy, an increase in her uncontrollable vomiting, internal tremors, inability to use her hands because of shaking tremors and pain, nerve damage, central nervous system damage, cognitive impairment, and Plaintiff's inability to swallow food or water. Each of these injuries and conditions were caused by defendants' failures to address Plaintiff's repeated requests for accommodations due to her preexisting medical disabilities as well as defendants' failure to repair and properly clean the air conditioner and its attached ducts in her unit and by their spraying chemicals inside her unit. Plaintiff hired an independent environmental investigator to test the particles in her apartment and discovered she was continually exposed to harmful mold (Stachybotrys), Cladosporium as well as dangerous PAH[2] and P-Nitrophenol at a

---

[2] Polycyclic Aromatic Hydrocarbons, a class of chemicals that occur naturally in coal, crude oil, and gasoline and that is also a chemical that causes neurological disorders.

1  level of "considerable concern"[3]. (See Exhibit A.)  In addition to pesticides and fungicides, P-

2  Nitrophenol also comes from vehicle exhaust.  Plaintiff's apartment was directly above the parking

3  garage for the 59-unit building, and the garage directly below her window only had a mesh screen

4  on it, causing the harmful vehicle exhaust to flow into her apartment constantly through the A/C

5  intake air ducts, which did not have an exterior air filter at all.  Additionally, there was a large crack

6  in the cement ceiling of the garage directly below Plaintiff's apartment which also contributed to the

7  vehicle exhaust entering her apartment.

8       106.    While Plaintiff had some preexisting medical conditions prior to moving into the

9  Accommodation, including fragrance/scent sensitivity and temperature dysregulation, during the

10  course of her residency there she went from being irritated by fragrances to collapsing in public if

11  she was exposed to scents, or any chemicals including laundry detergent, pesticides, car exhaust,

12  etc.  Additionally, during Plaintiff's residency at the Accommodation, as more fully set forth herein,

13  her neuropathy symptoms began, including internal and external tremors/shaking, numbness in her

14  extremities and inability to use her hands, teeth breaking, etc. as a result of her exposure to mold

15  and the other dangerous chemicals that were present in her unit.

16       107.    Defendants' negligent breach of their duty to Plaintiff was the direct/proximate cause

17  of her damages, including, but not limited to, medical costs, loss of past and future income and pain

18  and suffering.

19       108.    Wherefore, Plaintiff prays for judgment as set forth herein.

20                              **EIGHTH CAUSE OF ACTION**

21                          Intentional Infliction of Emotional Distress

22                            (Against ABRA, 4247 LP & Gorman)

23       109.    Plaintiff hereby incorporates all previous paragraphs as if they have been fully stated

24

25
_____
[3] P nitrophenol is a nerve agent causing severe nerve damage.

herein.

110.    Based on the foregoing facts, defendants' conduct was outrageous and either intended to cause Plaintiff emotional distress or engaged in with reckless disregard of the probability that Plaintiff would suffer emotional distress, which Plaintiff did indeed suffer from.  In fact, Plaintiff's emotional distress has been nearly debilitating for her during her stay at the Accommodation and since leaving.

111.    Plaintiff's emotional distress was certainly severe as described herein, and defendants' actions were the direct cause of said distress.  Plaintiff has suffered emotional damages in the form of extreme stress, embarrassment, anguish, nervousness, shock, humiliation, anxiety, worry, shame and fear of death.

112.    Wherefore Plaintiff prays for relief as set forth herein.

## **PRAYER**

Wherefore Plaintiff hereby prays for the following:

1.    On the First and Second causes of action, injunctive relief compelling Defendants to cease discrimination against disabled persons and remove all accessibility policy barriers that relate to Plaintiff's disability;

2.    On all causes of action, damages including actual damages in an amount to be proven at trial, in no event less than $75,000, or the applicable minimum statutory damages, whichever is greater;

3.    On the First and Sixth causes of action, punitive damages pursuant to Cal. Gov. Code §§12900 et seq. and applicable case law;

4.    On the Second cause of action, treble Plaintiff's actual and/or minimum statutory damages pursuant to California Civil Code §52;

5.    On the Sixth cause of action, civil penalties of $2,000 for each violation;

1      6.      On the First, Second, Third and Fourth causes of action, attorney's fees pursuant to

2  California Civil Code §52, California Government Code §12965, Code of Civil Procedure §1021.5

3  and/or other statute and the relevant agreements breached;

4      7.      Expenses;

5      8.      Costs of suit; and

6      9.      Other relief that the court deems appropriate.

7
                                              Respectfully Submitted,
8                                             THE ROWAN FIRM

9
10  DATED: April 4, 2024          By: *Dan Rowan Cortright*
                                              Dan Rowan Cortright, Esq.
11                                            Attorney for Plaintiff
                                              LISA ROTH
12

13

14

15

16

17

18

19

20

21

22

23

24

25